**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————

SUFFERN PARTNERS LLC,

                            Plaintiff,

    -against-

OLD REPUBLIC NATIONAL TITLE
INSURANCE COMPANY,

                          Defendant.

———————————————————————

:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 20-cv-8905-CS

**DECLARATION OF ISAAC
LEFKOWITZ IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION
FOR A PRELIMINARY INJUNCTION**

      **ISAAC LEFKOWITZ**, pursuant to 28 U.S.C. § 1746, hereby declares that the following is true and correct:

      1.      I am the CEO of Suffern Partners LLC ("Suffern"), the Plaintiff in this action. As such, I am fully familiar with the facts set forth below, which are true to the best of my personal knowledge or based upon the documents I have reviewed in connection with this matter. I respectfully submit this Declaration in opposition to the renewed motion by Defendant Old Republic National Title Insurance Company ("Old Republic") for a preliminary injunction against Suffern enjoining it from transferring certain monies as to which Old Republic has asserted counterclaims here. I am authorized by Suffern to provide this Declaration.

      **A.**      <u>The Underlying Bankruptcy Matter and Suffern's Purchase of the Property</u>

      2.      Suffern's primary asset is a 167-acre tract of property in Rockland County known as 25 Old Mill Road, along with the improvements thereon (the "Property"). Before Suffern acquired the Property, an entity known as RS Old Mill, LLC ("Debtor") agreed in November 2016 to purchase the Property from Novartis Corporation ("Novartis") for

$18 million. When Debtor was unable to secure financing to close on the sale, it sought Chapter 11 protection in the United States Bankruptcy Court for the Southern District of New York. After filing its Chapter 11 petition, Debtor assumed the sale agreement, and the Bankruptcy Court ordered that the closing on Debtor's purchase of the Property take place on or before August 17, 2017. Debtor, however, was apparently unable to secure direct financing for its acquisition of the Property.

3.    Novartis then sought forfeiture of Debtor's $2.5 million security deposit on the Property. To avoid losing the sale and its deposit, Debtor structured and implemented a transaction by which it acquired the Property from Novartis using financing Suffern obtained and then immediately re-conveyed the Property to Suffern, through Debtor's related entity called RS Old Mills Rd LLC ("RD"). Given certain time pressures, Debtor apparently did not obtain Bankruptcy Court approval for the transaction.

4.    To finance its purchase of the Property, Suffern obtained a $33 million mortgage loan from CPIF Lending, LLC ("CPIF"). Leading up to the closing, Suffern obtained Old Republic's assurance that it would issue an owner's title insurance policy (the "Policy") to insure Suffern's purchase and receipt of valid title to the Property at closing. The $30 million Policy insured Suffern against the risk that the Property's title would be vested in an entity other than Suffern, including the failure by any person or entity to have authorized the transfer or conveyance. Suffern paid more than $1.5 million in premiums to Old Republic and its agents for the Policy. Old Republic also would issue a separate $33 million mortgage policy in favor of Suffern's lender, CPIF.

5.    Riverside Abstract LLC ("Riverside") acted as Old Republic's agent in connection with issuance of the Policy to Suffern and closing on the sale of the Property.

2

Riverside executed an agreement requiring it to: (a) receive all purchase monies to be paid in connection with the transaction (the "Sale Funds"); (b) receive all original signed deeds for the Property transfers from Novartis to Debtor, Debtor to RD, and RD to Suffern; (c) distribute the Sale Funds to seller and for related closing costs; (d) record the original deeds and mortgage documents delivered in connection with the sale; and (e) deliver the Policy in favor of Suffern.    On or about September 5, 2017, CPIF transferred approximately $25.5 million to Riverside, with the remainder of Suffern's $33 million loan held back for lender fees, reserves, and other expenses.  The same day, Riverside received $12.5 million that the parties had obtained as a short-term loan to facilitate the transaction.  With these monies in place, Riverside distributed the balance due and owing to Novartis on the Property (approximately $16 million) and an additional $13.7 million to Debtor's counsel, Third-Party Defendant Thomas Landrigan.  The transaction closed on or about September 5, 2017, with Riverside recording all deeds and mortgage documents.  *See* Ex. A (Filed Deeds).

**B.    GoldmanRX's Purchase of Suffern, the Adversary Proceeding, and Suffern's Settlement of Claims with the Chapter 7 Trustee**

6.    In March 2019, my entity GoldmanRX, Inc. purchased 100 percent of the membership interests of Suffern for $500,000 from its previous owners, Goldie Reisman and an entity known as RSOM, Inc.  Neither I nor GoldmanRX – nor any other affiliated entity – had any prior business or corporate relationship, affiliation, or connection with Suffern, Reisman, or RSOM, Inc.  Once the acquisition closed, I became the CEO and am the sole principal of Suffern.  I also changed Suffern's statutory agent for service of process and other mailings to its current address in Brooklyn, which it shares with GoldmanRX.

7.    I understand that Old Republic claims two individuals, Isaac Genuth and Mark Yunger, have *de facto* control of Suffern and that I am a "straw person."  This is not true.

Those individuals have had absolutely no control over or connection to the Property, Suffern, GoldmanRX, or any affiliated entity since GoldmanRX purchased Suffern in March 2019. Since that time I have always been, and remain today, in control of Suffern and its operations.

8.      At the time that I acquired Suffern's membership interest, I was unaware that the sale of the Property to Suffern still required Bankruptcy Court approval or that there was any legal challenge to Suffern's title to the Property.  However, almost as soon as GoldmanRX bought Suffern, Debtor brought an adversary proceeding (the "Adversary Proceeding") claiming that its own failure to secure Bankruptcy Court approval of the September 2017 transaction required that it be voided, with title to the Property re-vested in Debtor.  Debtor filed notices of pendency against the Property in connection with the Adversary Proceeding.

9.      Suffern immediately notified its insurance carrier, Old Republic, of the Adversary Proceeding.  Old Republic acknowledged the claim and provided coverage to Suffern pursuant to the Policy, including to pay the costs of Suffern's legal defense, for which Hahn & Hessen was already and would continue to serve as counsel to Suffern.

10.     In light of the Adversary Proceeding, I conducted an investigation of the facts underlying Suffern's acquisition of the Property in September 2017, through which I learned the facts set forth above that took place before GoldmanRX's acquisition of Suffern.  Given those facts, I caused Suffern to immediately move before the Bankruptcy Court for approval of Debtor's sale of the Property, *nunc pro tunc*, and for dismissal of the Chapter 11 action. After a hearing on Suffern's motion, the Bankruptcy Court converted the Chapter 11 matter into one under Chapter 7 and appointed a Chapter 7 Trustee to administer Debtor's estate (the "Trustee").  After an independent investigation, the Trustee agreed to settle the dispute over Suffern's title to the Property in an agreement dated August 19, 2019 (the "Settlement

4

Agreement"). *See* Ex. B (Settlement Agreement). Under the terms of the Settlement Agreement, Suffern agreed to pay $2.5 million into a fund for all approved claims and expenses with respect to Debtor's estate (the "Claim Fund"). *See id.* The Trustee agreed to settle and dismiss the Adversary Proceeding, dismiss the notice of pendency against the Property, waive with prejudice any claims against Suffern concerning its title to the Property, and move for approval, *nunc pro tunc*, of Debtor's sale of the Property to RD. *See id.* The Settlement Agreement provided that "the balance of the Claim Fund (if any) after payment of all administrative expenses and/or allowed claims against [Debtor's] estate shall be returned to Suffern, care of its undersigned counsel [Hahn & Hessen LLP] within fourteen (14) days of the entry of an Order approving the Trustee's Final Report and Accounting." *See id.*, p. 4, ¶ 3.

11.     Before executing the Settlement Agreement, Suffern notified Old Republic of the settlement and its terms, and requested that Old Republic provide the $2.5 million settlement payment. Ultimately, Old Republic agreed to contribute $2 million of the settlement payment for Suffern's benefit and in furtherance of its obligations under the Policy, with Suffern contributing the $500,000 balance. Suffern and Old Republic thereafter wired $500,000 and $2 million, respectively, to Hahn & Hessen, which on behalf of Suffern then wired the funds to the Trustee. At the time, the parties never discussed nor executed any document or other writing by which Suffern promised that any funds the Trustee might return to Suffern would be forwarded to Old Republic. I also did not authorize Hahn & Hessen, as Suffern's counsel, to serve as an "escrow agent" in conjunction with receiving or returning any portion of the Claim Fund on Suffern's behalf.

12.     With the Claim Fund in place, the Trustee moved for approval of the Settlement Agreement and Debtor's sale of the Property to RD, *nunc pro tunc*. Old Republic did not object to the Trustee's motion, the Settlement Agreement, or otherwise take any action in the Bankruptcy Court to assert a claim with respect thereto. To the contrary, as noted above, Old Republic was involved in, fully knowledgeable of, and supported Suffern's resolution of the Adversary Proceeding with the Trustee, and Old Republic was informed as to every stage of the Adversary Proceeding.

13.     On January 14, 2020, the Bankruptcy Court issued an Order approving the Settlement Agreement and the sale of the Property, *nunc pro tunc* (the "Order"). *See* Ex. C (Order). The Order incorporated the Settlement Agreement. Shortly thereafter, the Trustee dismissed the Adversary Proceeding and cancelled the notice of pendency Debtor had filed against the Property.

### C.     Suffern's Agreement to Sell the Property and the Rockland County Action

14.     In March 2020, Suffern entered into an agreement to sell the Property for approximately $55 million. *See* Ex. D (Sale Agreement). Before executing the sale agreement, Suffern undertook a lengthy and robust marketing effort, led by Coldwell Banker Richard Ellis ("CBRE"). CBRE solicited several bids for the Property from a host of different reputable companies. After an initial due diligence period, the formal bidding process began. Ultimately, Suffern received seven bids for the Property, with the highest and best coming from an entity called IT Holder Entity LLC.

15.     The parties initially intended to close on the $55 million transaction in the summer of 2020. However, in April of 2020, RD sued Suffern in Rockland County Supreme Court (the "Rockland County Action") claiming it never received any of the Sale Funds

allegedly due to it during the September 2017 transaction, and thus did not authorize transfer of the Property to Suffern.  By its complaint, with which it filed a *lis penden* against the Property, RD alleges that Suffern does not hold proper title in the Property and seeks to rescind the September 2017 transfer, and thereby to re-vest title in RD.

16.     After RD brought the Rockland County Action, Suffern submitted a claim to Old Republic to defend and provide coverage pursuant to the Policy.  Old Republic denied the claim.  Old Republic also refused Suffern's multiple requests for reconsideration.  Accordingly, Suffern commenced this action, bringing claims against Old Republic for its breach of the Policy and all damages arising from the conduct that RD alleges in the Rockland County Action.

### D.    Old Republic's Counterclaims in this Action

17.     In the summer of 2020, the Bankruptcy Court Trustee filed her final report and accounting ("Final Report").  *See* Ex. E (Final Report).  The Final Report noted that, after paying all allowed claims and professional fees, approximately $2 million remained available and would be returned to Suffern on its claim against the Debtor's estate and pursuant to the terms of the Settlement Agreement. *See id.*, p. 13.  The Trustee also reported that Old Republic had withdrawn a claim it filed against Debtor's estate, leaving it without the right to any distribution from the Claim Fund.  *See id.*, pp. 5, 10.  Old Republic was informed of the Trustee's filing of her Final Report, and never objected to it.  On September 24, 2020, the Bankruptcy Court issued an Order approving the Final Report.  *See* Ex. F (Order).

18.     On September 29, 2020, pursuant to the Bankruptcy Court-approved Settlement Agreement, Order, and Final Report, the Trustee delivered a check to Suffern's attorneys, Hahn & Hessen LLP, in the amount of $1,984,483.36 (the "Check").  The Trustee

made the Check payable to Suffern as required by the Settlement Agreement and the Order. *See* Ex. B, p. 4, ¶ 3 ("the balance of the Claim Fund … shall be returned to Suffern"); Ex. G (Check).  Suffern's counsel then delivered the Check for Suffern, which was deposited into Suffern's own bank account.

19.     Old Republic now claims in this action that it is entitled to a portion of the Check.  Old Republic claims that Suffern's counsel agreed to act as an "escrow agent" in conjunction with the Claim Fund and any balance thereof that was required to be returned to Suffern.  This is absolutely incorrect.  Neither Suffern, nor its counsel, ever agreed to act as an "escrow agent" in any way with respect to the Claim Fund or any balance that might be returned to Suffern.  As noted, Old Republic contributed $2 million to the Claim Fund further to its obligations under the Policy and in providing such coverage to Suffern.

20.     Critically, this action concerns Suffern's claims against Old Republic for wrongfully denying insurance coverage as to the Rockland County Action and any failures that may have occurred during the September 2017 transaction that gave rise to the Rockland County Action.  Those claims entitle Suffern to tens of millions of dollars in damages.  Until Suffern is made whole and its claims herein are resolved, Suffern does not owe any monies to Old Republic.  As I previously advised Old Republic in October 2020, if Old Republic provides coverage to Suffern as the Policy requires, or Suffern's anticipated sale of the Property in excess of $50 million is able to close (for which Old Republic has been consulted and is anticipated to provide title insurance), to the extent Suffern then has no damages, the monies received as a return on Suffern's Claim Fund will be provided to Old Republic. *See* Ex. H (October 2020 Email).

21.     Lastly, I understand that Old Republic, in both its initial motion for a temporary restraining order and a preliminary injunction and its renewed request for injunctive relief, claims that I am the defendant named in three collection actions in Rockland County: *American Express National Bank v. Isaac Lefkowitz*; *Citibank, N.A. v. Isaac Lefkowitz*; and *Discover Bank v. Isaac Lefkowitz*.  I am not the defendant in these actions.

*[continued on next page]*

22.     I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge, information, and belief.

DATED:      New York, New York
            April 5, 2021

_____
**ISAAC LEFKOWITZ**

✓