# EXHIBIT D

PURCHASE AND SALE AGREEMENT

between

SUFFERN PARTNERS LLC,

as Seller,

and

IT HOLDER ENTITY LLC,

as Buyer

March 9, 2020

175047/004 - 7140022.6

TABLE OF CONTENTS

Page

Article I PURCHASE AND SALE ..................................................................4
    Section 1.1.    Sale..................................................................4
    Section 1.2.    Excluded Property..................................................5
    Section 1.3.    Purchase Price. ....................................................5
    Section 1.4.    Closing ..............................................................6

Article II DUE DILIGENCE BY BUYER .......................................................6
    Section 2.1.    Buyer's Due Diligence Period.................................6
    Section 2.2.    Buyer's Right to Terminate...................................7

Article III TITLE............................................................................................8
    Section 3.1.    Conditions of Title. ..............................................8
    Section 3.2.    Evidence of Title ................................................11

Article IV REPRESENTATIONS AND WARRANTIES .............................11
    Section 4.1.    Representations and Warranties of Seller ............11
    Section 4.2.    Representations and Warranties of Buyer............13

Article V RISK OF LOSS AND INSURANCE PROCEEDS ........................14
    Section 5.1.    Condemnation ...................................................14
    Section 5.2.    Casualty Loss – Material ....................................15
    Section 5.3.    Casualty Loss – Immaterial ................................15

Article VI SELLER'S COVENANTS............................................................15
    Section 6.1.    Operation of Property.........................................16
    Section 6.2.    Maintenance of Insurance ..................................16
    Section 6.3.    Notices .............................................................16
    Section 6.4.    No Service Contracts..........................................16
    Section 6.5.    No Leases .........................................................16
    Section 6.6.    No Other Agreements .........................................16
    Section 6.7.    Zoning..............................................................16
    Section 6.8.    Pending Litigation..............................................16

Article VII CLOSING AND RELATED MATTERS......................................16
    Section 7.1.    Buyer's Conditions to Closing .............................16
    Section 7.2.    Seller's Conditions to Closing..............................17
    Section 7.3.    Closing Deliveries. .............................................17
    Section 7.4.    Other Closing Deliveries ....................................19

Article VIII PRORATIONS AND APPORTIONMENT OF CLOSING COSTS. ...........19
    Section 8.1.    General.............................................................19
    Section 8.2.    Closing Statement..............................................21
    Section 8.3.    Closing Costs ....................................................21

Section 8.4.    Survival ................................................................................... 22

Article IX BROKERS AND EXPENSES ........................................................... 22
Section 9.1.    Brokers ................................................................................... 22

Article X REMEDIES ........................................................................................ 22
Section 10.1.    Buyer's Remedies .................................................................. 22
Section 10.2.    Cure Period .......................................................................... 23

Article XI CONDITION OF PROPERTY ......................................................... 23
Section 11.1.    NO SIDE AGREEMENTS OR REPRESENTATIONS; AS-IS PURCHASE ....................................................................... 23

Article XII LIMITED LIABILITY; INDEMNIFICATION. ............................. 25
Section 12.1.    Limited Recourse ................................................................. 25
Section 12.2.    Survival ................................................................................. 25

Article XIII MISCELLANEOUS ....................................................................... 26
Section 13.1.    Notices .................................................................................. 26
Section 13.2.    Entire Agreement ................................................................. 27
Section 13.3.    Time of the Essence .............................................................. 27
Section 13.4.    Assignment ........................................................................... 27
Section 13.5.    Counterparts; Facsimile; Electronic Signatures ................. 27
Section 13.6.    Governing Law; Jurisdiction. .............................................. 27
Section 13.7.    Interpretation of Agreement ................................................ 28
Section 13.8.    Amendments ......................................................................... 28
Section 13.9.    No Recording ........................................................................ 28
Section 13.10.   Drafts Not an Offer to Enter Into a Legally Binding Contract ........ 28
Section 13.11.   No Partnership ..................................................................... 28
Section 13.12.   No Third Party Beneficiary .................................................. 29
Section 13.13.   Survival ................................................................................. 29
Section 13.14.   Jury Waiver .......................................................................... 29
Section 13.15.   Confidentiality ..................................................................... 29
Section 13.16.   Return or Destruction of Confidential Information ............. 30
Section 13.17.   Survival of Article XIII ........................................................ 30

Article XIV ESCROW PROVISIONS ............................................................... 30
Section 14.1.    Escrow Provisions ................................................................ 30
Section 14.2.    Acknowledgments of Parties ................................................ 30

## LIST OF EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit 1.1(a) | Real Property Description |
| Schedule 1.2 | Excluded Property |
| Schedule 4.1(j) | Pending Litigation |
| Schedule 4.1(k) | Zoning Change Application |

## PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "Agreement"), dated as of March 9, 2020 (the "Effective Date"), is between SUFFERN PARTNERS LLC a New York limited liability company ("Seller"), and IT HOLDER ENTITY LLC, a New Jersey limited liability company ("Buyer").

## WITNESSETH:

**WHEREAS**, Seller is the owner the Property (as hereinafter defined); and

**WHEREAS**, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Property, on the terms and subject to the conditions contained in this Agreement; and

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## PURCHASE AND SALE

**Section 1.1.  Sale**.  Seller agrees to sell and convey to Buyer and Buyer agrees to purchase from Seller, upon the terms and conditions hereinafter set forth, all right, title, and interest of Seller in and to the following (collectively referred to herein as the "Property")::

(a)     Real Property.  The real property known as (i) 25 Old Mill Road, Suffern, New York 10901 (Section: 55.22, Block 1, Lot 1), (ii) 19 Hemion Road, Montebello, New York 10901 (Section: 55.6, Block 1, Lot 1) and (iii) Route 59, Suffern, New York 10901 (Section: 55.37, Block 1, Lot 31) each located in Rockland County, New York as more particularly described in Exhibit 1.1(a) attached hereto and made a part hereof (the "Land"), together with: (i) all improvements located thereon, including all buildings and structures used in connection with the operation or occupancy thereof (the "Improvements"); and (ii) all rights, benefits, privileges, easements, tenements, hereditaments, rights-of-way and other appurtenances thereon or in any way appertaining thereto, including all mineral, oil and gas rights, development rights, air and water rights and any rights of way or other appurtenances used in connection with the beneficial use and enjoyment of the Land and/or Improvements; and (iii) all strips and gores and any land lying in the bed of any street, road or alley, open or proposed, adjoining such Land (collectively with the Land and Improvements, the "Real Property");

(b)     all articles of personal property located on and used in connection with the operation of the Improvements (collectively, the "Personal Property"), to the extent any of same are owned by Seller;

(c)      plans, specifications, architectural and engineering drawings, prints, surveys, soil and substrata studies relating to the Property in Seller's possession, whether or not stored, managed or contained on computer software or hardware;

(d)      all operating manuals and books, data and records regarding the Property and its component systems in Seller's possession;

(e)      all licenses, permits, certificates of occupancy and other approvals issued by any state, federal or local authority relating to the use, maintenance or operation of the Property included in this sale to the extent that they may be transferred or assigned;

(f)      all warranties or guaranties, if any, applicable to the Property, to the extent such warranties or guaranties are assignable;

(g)      all tradenames, trademarks, servicemarks, logos, copyrights and good will relating to or used in connection with the operation of the Property;

(h)      air rights and development rights; and

(i)      all other rights, privileges, easements, licenses, appurtenances, and hereditaments relating to the Property.

**Section 1.2.   Excluded Property**.  The following are excluded from the definition of "Property": (i) equipment and fixtures, (ii) items of personal property owned by tenants of the Property, (ii)  items of personal property owned by third parties and currently leased to Seller, (iii) non-refundable tenant deposits, (iv) initial inducement payments made to Seller by providers of telephone, cable and similar services; (v) any pre-Closing rights under casualty insurance policies maintained by Seller related to the Property; (vi) any claims of Seller existing on or attributable to any period prior to the Closing Date related to the Property; (vii) any right to the name, trade names, logos, marks or insignia of "Suffern Partners"; and (viii) any personal property described on Schedule 1.2 attached hereto. Seller shall have the right to remove any Excluded Property prior to or subsequent to Closing, provided that, Seller agrees not to remove any mechanical systems, i.e. plumbing, heating air conditioning and electric systems until such time as Buyer makes a determination to demolish the Improvements, which decision will be promptly communicated to Seller. The foregoing obligations shall survive the Closing.

**Section 1.3.   Purchase Price.**

(a)      The purchase price to be paid by Buyer to Seller for the Property (the "Purchase Price") is FIFTY-FIVE MILLION and 00/100 DOLLARS ($55,000,000).

(b)      The Purchase Price, as decreased by any prorations payable by Seller hereunder and increased by any prorations payable by Buyer hereunder and as otherwise adjusted in accordance with the provisions hereof, shall be paid, as follows:

(i)      Within three (3) business days of the Effective Date, Buyer shall deposit in escrow with Alan Rubinstein, Esq., Horowitz and Rubinstein LLC, 990 Stewart

5

Avenue, Suite 201, Garden City, New York 11530 ("Escrow Agent") the amount of $500,000 (together with all accrued interest thereon, the "Initial Deposit") in cash in immediately available funds.

        (ii)    Within two (2) business day after the expiration of the Due Diligence Period (as defined below), provided that Buyer shall not have terminated this Agreement pursuant to the provisions of Section 2.2, Buyer shall deposit in escrow with the Escrow Agent a further sum of $500,000, in cash in immediately available funds, as a further deposit hereunder (together with all interest accrued thereon, the "Additional Deposit," and together with the Initial Deposit, the "Deposit").

        (iii)    The balance of the Purchase Price (plus or minus the prorations pursuant to Article VIII below) shall be paid in accordance with Section 7.3(b) at the consummation of the purchase and sale contemplated hereunder (the "Closing").

        (c)    The Deposit shall be held by the Escrow Agent in an interest bearing account insured by the Federal Deposit Insurance Corporation ("FDIC"), provided that separate accounts shall not be required to be established in the event that the amount of the Deposit shall exceed the per account limits of the FDIC.

        (d)    The Purchase Price assumes a $5,000,000 investment in Buyer's purchasing entity by Seller or its designee. Such investment shall be as a "member" with Seller (or its designee) having no different management or voting rights than any of the Buyer's other investors. Management of said entity shall be solely vested in Azi Mandel and/or Adam Mermelstein (directly or indirectly, through one or more entities controlled by them or by any one or more of them) and Seller (or its designee) shall have no management function whatsoever. If, for any reason, Seller does not invest said $5,000,000 in the Buyer's purchasing entity (other than Buyer's refusal to permit Seller to remove equipment and fixtures from the Property which constitute "Excluded Property"), the Purchase Price shall be reduced by $5,000,000.

    **Section 1.4. Closing**. The Closing for the sale of the Property pursuant to the terms of this Agreement shall take place in escrow with the Title Company (as hereafter defined) or as otherwise mutually agreed at or before 5:00 P.M. EDT on the first date that is a business day after the date that is forty-five (45) days following the expiration of the Due Diligence Period (as hereafter defined) or on such other earlier date and time as Seller and Buyer may mutually agree upon in writing (the "Closing Date").

**ARTICLE II**

**DUE DILIGENCE BY BUYER**

    **Section 2.1. Buyer's Due Diligence Period**. From the Effective Date until the Closing Date or earlier termination of this Agreement, Buyer, personally or through its authorized agent or representative, shall be entitled upon reasonable advance notice to Seller to enter upon the Real Property during normal business hours and shall have the right to make such investigations, including appraisals, engineering studies, soil tests,

6

environmental studies and underwriting analyses, as Buyer deems necessary or advisable, subject to the following limitations: (a) such access shall not violate any law or agreement to which Seller is a party or otherwise expose Seller to a material risk of liability; (b) Buyer shall give Seller written notice at least two (2) business days before conducting any inspections, and a representative of Seller shall have the right to be present when Buyer or its representatives conducts its or their investigations on the Property; (c) neither Buyer nor its representatives shall unreasonably interfere with the use, occupancy or enjoyment of any tenants, subtenants or other occupants of the Property or their respective employees, contractors, customers or guests; (d) neither Buyer nor its agents shall damage the Property or any portion thereof; (e) unless Seller agrees otherwise, before Buyer or its agents or consultants enter onto the Real Property, Buyer or the party entering the Real Property shall deliver to Seller a certificate of insurance naming Seller as an additional insured, evidencing commercial general liability insurance (including property damage, bodily injury and death) issued by an insurance company having a rating of at least "A-X" by A.M. Best Company, with limits of at least $1,000,000 per occurrence for bodily or personal injury or death and $2,000,000 aggregate per location; (f) Buyer shall: (i) use reasonable efforts to perform all on-site due diligence reviews on an expeditious and efficient basis; and (ii) indemnify, hold harmless and defend the Seller and Seller's direct and indirect owners, and their respective agents, officers, directors, trustees, advisors, managers, members, agents, employees and counsel (collectively, the "Seller Parties") against, and hold the Seller Parties harmless from, all loss, liability, claims, costs (including reasonable attorneys' fees), liens and damages resulting from or relating to the activities of Buyer or its agents under this paragraph; and (g) without Seller's prior written consent, which Seller may give or withhold in its sole and absolute discretion, Buyer shall not conduct any Phase II environmental site assessments, soil borings, groundwater testing or other invasive tests on or around the Real Property. The foregoing indemnification obligation shall survive the Closing or termination of this Agreement.

**Section 2.2.  Buyer's Right to Terminate**.  Buyer shall have the right, in its sole discretion, to terminate this Agreement at any time prior to 5:00 P.M. EDT on the day that is sixty (60) days after the Effective Date (such period commencing on the Effective Date and ending on such sixtieth (60th) day, the "Initial Due Diligence Period"). Buyer shall have an automatic right to extend the Initial Due Diligence for an additional thirty (30) days (the "Due Diligence Extension Period") upon written notice to Seller which must be given at two business days prior to the end of the Initial Due Diligence Period (the Initial Due Diligence Period, as may be extended for the Due Diligence Extension Period is hereafter referred to collectively as the "Due Diligence Period").  In order to exercise its right to terminate this Agreement, Buyer or its legal counsel must deliver written notice of termination to Seller and the Escrow Agent prior to expiration of the Due Diligence Period. Upon receipt of any such timely notice, the Escrow Agent shall return the Initial Deposit to Buyer and this Agreement shall terminate and no party hereunder shall have any further rights or obligations under this Agreement other than those rights and obligations that are expressly stated to survive the termination of this Agreement. If the foregoing termination notice is not delivered to Seller and the Escrow Agent by 5:00 P.M. EDT on the last day of the Due Diligence Period, Buyer shall (a) have no further right to terminate this Agreement pursuant to this Section 2.2 and (b) deposit the Additional Deposit with the Escrow Agent

pursuant to Section 1.3(b)(ii) and the Deposit shall become non-refundable, except as otherwise expressly provided in this Agreement.  If a termination notice is not timely delivered by Buyer or its legal counsel as contemplated by this Section 2.2 and Buyer has not timely deposited the Additional Deposit with the Escrow Agent pursuant to Section 1.3(b)(ii), Seller shall be entitled to terminate this Agreement and Escrow Agent shall immediately deliver the Initial Deposit to Seller and the parties shall have no further rights, obligations or liabilities hereunder.

## ARTICLE III

## TITLE

**Section 3.1.   Conditions of Title.**

     (a)    Buyer shall promptly order, at its sole cost and expense:

     (i)    a commitment for title insurance from the Old Republic Title Insurance Company (the "Title Company"), engaged through Madison Title Agency LLC. The title commitment ordered by Buyer shall include true, legible (to the extent available), and complete copies of any tax search, departmental or municipal searches, and all instruments giving rise to any defects or exceptions to title to the Property (collectively, the "Title Report"), which Title Report shall be delivered to counsel for both Buyer and Seller concurrently; and

     (ii)    either an update of an existing survey in possession of Seller or a new survey of the Property, prepared by a surveyor licensed by New York State ("Buyer's Survey"), which Buyer's Survey shall be delivered to counsel for both Buyer and Seller concurrently.

     (b)    No later than ten (10) business days prior to the end of the Due Diligence Period (the "Title Objection Period"), Buyer shall furnish Seller with a written statement of objections, if any, to the title to the Real Property (collectively, "Objections"). If Seller receives a notice of Objection(s) in accordance with this Section 3.1(b) ("Buyer's Notice"), Seller shall have the right, but not the obligation, by giving written notice to Buyer within five (5) business days after receipt of Buyer's Notice ("Seller's Cure Response Period"), to elect to cure all or any such matters on or before the Closing Date (a "Seller's Cure Response"), and Seller may extend the Closing Date for up to fifteen (15) business days to allow for such cure.  If Seller does not deliver any Seller's Cure Response, Seller shall be deemed to have elected not to cure any such matters.  If Seller does deliver a Seller's Cure Response during Seller's Cure Response Period, Seller shall be deemed to have elected to cure only those Objections as expressly provided for in such Seller's Cure Response.  In the event that Buyer does not terminate this Agreement in accordance with Section 2.2, (i) any Objections which Buyer has not raised in a timely fashion in a Buyer's Notice and (ii) any Objections which Seller elects not to, or is deemed to have elected not to cure, shall be deemed to have been approved by Buyer (other than Monetary Encumbrances, as defined below), which matters (other than Monetary Encumbrances) shall be considered to be Permitted Encumbrances (as defined below).

(c)      Notwithstanding the foregoing, regardless of whether or not Buyer delivered any Objections, Seller shall be required to satisfy of record, by removing or bonding over, any monetary encumbrances, including mortgages, deeds of trust, deeds to secure debt, judgments, mechanics' liens, materialmen's liens, delinquent taxes, delinquent water and sewer charges, and filed broker's liens, but excluding liens or encumbrances caused by the actions of Buyer or others acting for or on behalf of Buyer (collectively, "Monetary Encumbrances") that appear on the Title Report.

(d)      If Seller notifies Buyer that it elects to cure any Objection but then does not for any reason cure such Objection on or before the Closing Date, as it may be extended hereunder, then Buyer, as its sole and exclusive remedy, shall have the option of terminating this Agreement by delivering written notice thereof to Seller and the Escrow Agent no later than one business day prior to the Closing Date.  In the event of such a valid termination by Buyer, the Deposit shall be returned to Buyer, Seller shall reimburse Buyer for Buyer's third party out of pocket expenses incurred in connection with this transaction, not to exceed $250,000 in the aggregate (which expenses shall be itemized by Buyer) and thereafter no party shall have any further rights or obligations hereunder other than those rights and obligations that are expressly stated to survive the termination of this Agreement. If no such termination notice is timely received by Seller hereunder, Buyer shall be deemed to have waived all such Objections, in which event those Objections shall become Permitted Encumbrances.

(e)      At the Closing, subject to the terms hereof, Buyer shall own the Property free and clear of all liens, encumbrances, leases, tenancies, covenants, conditions, restrictions, rights-of-way, easements and other matters affecting title, subject to the Permitted Encumbrances.

(f)      The term "Permitted Encumbrances" shall mean:

(i)      any and all present and future zoning, building, environmental and other laws, statutes, ordinances, codes, rules, regulations, requirements, or executive mandates of all governmental authorities having jurisdiction with respect to the Property, including, without limitation, landmark designations and all zoning variances and special exceptions, if any;

(ii)      possible encroachments and/or projections of stoop areas, roof cornices, window trims, vent pipes, cellar doors, steps, columns and column bases, flue pipes, signs, piers, lintels, window sills, fire escapes, satellite dishes, protective netting; sidewalk sheds, ledges, fences, coping walls (including retaining walls and yard walls), air conditioners, and the like, if any, on, under or above any street or highway, the Property or any adjoining property;

(iii)      any state of facts that an accurate survey of the Property would disclose;

        (iv)    all presently existing and future liens for unpaid real estate taxes, assessments, and water and sewer charges that are not due and payable as of the Closing Date, subject to any apportionments as provided for in this Agreement;

        (v)    all covenants, restrictions and rights and all easements and agreements for the erection and/or maintenance of water, gas, steam, electric, telephone, sewer or other utility pipelines, poles, wires, conduits, or other like facilities, and appurtenances thereto, over, across, and under the Property;

        (vi)    party walls and party wall rights; beams and beam rights; the possible revocable nature of or lack of right to maintain vaults or other improvements or installations beyond building or property lines.

        (vii)    variations between tax lot lines and lines of record title;

        (viii)    any lien or encumbrance arising out of the acts or omissions of the Buyer;

        (ix)    consents by Seller or any former owner for the erection and maintenance of any structures on, under, or above any streets or roads on which the Property may abut;

        (x)    any exceptions disclosed on Schedule B of the Title Report which will be extinguished upon the transfer of the Property;

        (xi)    the standard conditions and exceptions to title contained in the form of title policy or "marked-up" Title Report issued to Buyer by the Title Company;

        (xii)    the provisions of applicable laws, including official plans, zoning, land use and building by-laws, plats, planned unit developments, codes, regulations, ordinances and decisions of municipal authorities or their instrumentalities or authorized committees permitting variances therefrom; and

        (xiii)    such other matters as the Title Company shall be willing, without special premium, to omit as exceptions to title insurance coverage.

        (g)    Whether or not Buyer shall have furnished to Seller any Objections, Buyer may, at or prior to Closing, notify Seller in writing of any objections to title first raised by the Title Company between (a) the date of the Title Commitment and (b) the date on which the transaction contemplated herein is scheduled to close.  With respect to any objections to title set forth in such notice, Seller shall have the same option to cure and Buyer shall have the same option to accept title subject to such matters or to terminate this Agreement as those which apply to any notice of objections made by Buyer before the expiration of the title review period within the Title Objection Period.  If Seller elects to attempt to cure any such matters, the date for Closing shall be automatically extended by a reasonable additional time to effect such a cure, but in no event shall the extension exceed fifteen (15) days after the date for Closing set forth herein.

**Section 3.2.  Evidence of Title**.  Seller's title to the Real Property as of the Closing Date in accordance with the foregoing shall be evidenced by, and a condition to Buyer's obligation to consummate the Closing hereunder shall be, the undertaking by the Title Company to issue, at Closing, upon payment of the applicable premium by Buyer, its standard coverage owner's policy of title insurance in the amount of the Purchase Price showing title to the Real Property vested in Seller, subject only to the Permitted Encumbrances and other standard policy exceptions (the "Title Policy").  Buyer may request special endorsements to the Title Policy; provided, however, that Buyer shall obtain the commitment of the Title Company to issue such endorsements prior to the expiration of the Due Diligence Period.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

**Section 4.1.  Representations and Warranties of Seller**.  Seller represents and warrants to Buyer as follows:

(a)     Seller is a limited liability company, has been duly formed, is validly existing, and is in good standing in the State of New York.

(b)     As of the Closing Date, Seller shall have full power, authority and legal right to close the transactions contemplated hereby and to perform all its obligations hereunder, and will take all action required by applicable law, its governing instruments or otherwise to authorize the performance of this Agreement and consummation of the transactions contemplated hereby and the delivery of all agreements, certificates and other documents or instruments contemplated hereby.

(c)     The documents to be executed at Closing pursuant hereto or in connection herewith, when so executed and delivered, by Seller will constitute, the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with its and their terms.

(d)     At Closing, the execution or delivery by Seller of documents executed by Seller pursuant hereto, the consummation of the transactions contemplated hereby and compliance with the terms, conditions and provisions thereof, will not (x) conflict with or result in a breach by Seller of the terms, conditions or provisions of its  (A) articles of organization, operating agreement or other applicable governing documents, (B) any applicable license, permit, statute, ordinance, law, judgment, order, writ, injunction, decree, rule or regulation of any court, administrative agency or other governmental authority or of any determination or award of any arbitrator binding on Seller, or on any of its properties, or (C) any agreement or instrument to which Seller is a party or by which it or any of its properties are bound or constitute a default thereunder, or (y) result in the creation or imposition of any lien, charge or encumbrance upon the Property (not including the proceeds of the sale to Buyer).

(e)     Any authorization, consent, approval, license or examination of, and any registration, qualification, designation or filing with any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign which is necessary for (x) the valid execution and delivery by Seller of the Closing documents to be executed by Seller pursuant hereto or (y) the consummation of the transactions contemplated hereby will have been obtained by Seller by Closing. At Closing, any authorization, consent, approval of any member, shareholder, partner, creditor or investor necessary for (x) the valid execution and delivery by Seller of any documents executed by Seller pursuant hereto or (y) the consummation of the transactions contemplated hereby, will have been obtained by Seller.

(f)     Seller has not (i) made a general assignment for the benefit of creditors, (ii) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition by Seller's creditors, (iii) suffered the appointment of a receiver to take possession of all, or substantially all, of Seller's assets, (iv) suffered the attachment or other judicial seizure of all, or substantially all, of Seller's assets, (v) admitted in writing its inability to pay its debts as they come due, or (vi) made an offer of settlement, extension or composition to its creditors generally.

(g)     The Property will be vacant at Closing.

(h)     There are no service contracts on the Property nor any management agreements affecting the Property.

(i)     Seller has not received any notice of any condemnation or similar proceeding currently pending against the Property, and, to the Knowledge of Seller, no such proceeding is threatened against the Property.

(j)     There is no litigation pending with respect to Seller or the Property except as set forth in Schedule 4.1(j).

(k)     Seller has not initiated, and Seller has not received any written notice of, an application for a change in the current zoning for the Real Property except as set forth in Schedule 4.1(k).

(l)     Seller is not a "foreign person" under the Foreign Investment in Real Property Tax Act of 1980 ("**FIRPTA**") and upon consummation of the transaction contemplated hereby, Buyer will not be required to withhold from the Purchase Price any withholding tax;

(m)     Neither Seller, nor to Seller's knowledge, any person or entity with actual authority to direct the actions of Seller, (i) are named on any list of persons, entities and governments issued by the Office of Foreign Assets Control of the United States Department of the Treasury ("**OFAC**") pursuant to Executive Order 13224 – Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism ("**Executive Order 13224**"), as in effect on the date hereof, or any similar list known to Seller or publicly issued by OFAC or any other department or agency

of the United States of America (collectively, the "**OFAC Lists**"), (ii) are included in, owned by, controlled by, knowingly acting for or on behalf of, knowingly providing assistance, support, sponsorship, or services of any kind to, or otherwise knowingly associated with any of the persons, entities or governments referred to or described in the OFAC Lists, or (iii) has knowingly conducted business with or knowingly engaged in any transaction with any person, entity or government named on any of the OFAC Lists or any person, entity or government included in, owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or, to Seller's knowledge, otherwise associated with any of the persons, entities or governments referred to or described in the OFAC Lists; and

(n)     There are no employees of Seller engaged in the operation or maintenance of the Real Property and Improvements.

For purposes of this Agreement, "Seller's knowledge" and "to the knowledge of Seller" shall specifically mean and be limited to the actual knowledge of Isaac Lefkowitz who shall not be personally liable for any inaccurate or incomplete statement or information.  Seller represents and warrants that Isaac Lefkowitz is the most knowledgeable person with respect to the matters which are the subject of such representations and warranties.

Each of the representations and warranties of Seller contained in this Agreement shall survive Closing for a period of one hundred eighty (180) days from the Closing Date in accordance with Section 12.4.

**Section 4.2.   Representations and Warranties of Buyer**.   Buyer represents and warrants to Seller as follows:

(a)     Buyer has been duly formed, is validly existing, and is in good standing in the state in which it was formed.

(b)     Buyer has full power, authority and legal right to enter into this Agreement and the transactions contemplated hereby and to perform all its obligations hereunder, and has taken all action required by applicable law, its governing instruments or otherwise to authorize the execution, delivery and performance of this Agreement and consummation of the transactions contemplated hereby.

(c)     This Agreement and any other documents executed pursuant hereto or in connection herewith constitute, and when so executed and delivered, by Buyer under or in connection with this Agreement, will constitute, the legal, valid and binding obligations of Buyer, enforceable against Buyer in accordance with its and their terms.

(d)     Neither the execution or delivery by Buyer of this Agreement or any other documents executed by Buyer pursuant hereto, nor the consummation of the transactions contemplated hereby, nor compliance with the terms, conditions and provisions hereof or thereof, will conflict with or result in a breach by Buyer of the terms, conditions or provisions of (A) its organizational documents, (B) any applicable license, permit, statute,

ordinance, law, judgment, order, writ, injunction, decree, rule or regulation of any court, administrative agency or other governmental authority or of any determination or award of any arbitrator binding on Buyer, or on any of its properties, or (C) any agreement or instrument to which Buyer is a party or by which Buyer or any of its properties are bound or constitute a default thereunder.

(e)     No authorization, consent, approval, license or examination of, and no registration, qualification, designation or filing with any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign is or was necessary to (x) the valid execution and delivery by Buyer of this Agreement and any of the other documents executed by Buyer pursuant hereto or (y) the consummation of the transactions contemplated hereby.  No authorization, consent, approval of any member, shareholder, partner, creditor or investor is or was necessary to (x) the valid execution and delivery by Buyer of this Agreement and any other documents executed by Buyer pursuant hereto or (y) the consummation of the transactions contemplated hereby, which has not been obtained by Buyer.

(f)     Buyer has not (i) made a general assignment for the benefit of creditors, (ii) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition by Buyer's creditors, (iii) suffered the appointment of a receiver to take possession of all, or substantially all, of Buyer's assets, (iv) suffered the attachment or other judicial seizure of all, or substantially all, of Buyer's assets, (v) admitted in writing its inability to pay its debts as they come due, or (vi) made an offer of settlement, extension or composition to its creditors generally.

(g)     There are no judgments, orders or decrees of any kind against Buyer unpaid or unsatisfied of record and no legal action, suit or other legal or administrative proceeding pending or to Buyer's knowledge, threatened or reasonably anticipated before any court or administrative agency against Buyer which would, or would reasonably be expected to materially adversely affect the ability of Buyer to perform its obligations under this Agreement.

(h)     Buyer acknowledges that it has been advised by Seller that the membership interests in Seller are subject to a pledge agreement and that at Closing, such pledge agreement and any restrictions on Seller's right to sell the Property will be released.

Each of the representations and warranties of Buyer contained in this Agreement:  (i) is made as of the Effective Date, (ii) shall be remade by Buyer in a certificate delivered to Seller on the Closing Date and (iii) shall survive Closing for a period of one hundred eighty (180) days.

## ARTICLE V

## RISK OF LOSS AND INSURANCE PROCEEDS

**Section 5.1.  Condemnation**.  If, prior to the Closing Date, the Property, or any part of the Property, is taken by eminent domain (or is the subject of a pending or

14

contemplated taking which has not been consummated), Seller shall notify Buyer of such fact, and Buyer shall have the option (which option shall be set forth in a notice from Buyer to Seller given not later than fifteen (15) business days after receipt of the notice from Seller):

     (i) to terminate this Agreement with respect to the Property, in which event, the Deposit shall be returned to Buyer; or

     (ii) to accept title to the Property (other than the portion so taken), without abatement of the Purchase Price, in which event Seller shall assign and turn over to Buyer at the Closing, and Buyer shall be entitled to receive and keep, all amounts awarded, or to be awarded, as the result of the taking.

  **Section 5.2. Casualty Loss – Material**.  If, prior to the Closing Date, all or any material part of the Property is damaged or destroyed by fire or other casualty, Seller shall notify Buyer of such fact, and Buyer shall have the option (which option shall be set forth in a notice from Buyer to Seller given not later than fifteen (15) business days after receipt of the notice from Seller):

     (i) to terminate this Agreement, in which event the Deposit shall be returned to Buyer; or

     (ii) to accept title to the Property without abatement of the Purchase Price, in which event Seller shall assign to Buyer, at the Closing, all of the right, title and interest of Seller in and to the insurance proceeds awarded or to be awarded to Seller as the result of such damage or destruction, giving Buyer a credit at Closing for any deductible under the insurance policy, less any amounts paid for restoration.

  **Section 5.3. Casualty Loss – Immaterial**.  In the event there is damage to or destruction of an immaterial part of the Property by fire or other casualty, such damage or destruction shall, subject to receipt of insurance proceeds, be repaired promptly by Seller, and in the event such damage or destruction cannot be fully repaired by the Closing Date, then at the option of Buyer (i) the Closing shall be postponed until such repairs shall have been completed, or (ii) the Closing shall be held as scheduled, and Buyer shall accept title to the Property without abatement of the Purchase Price, in which event Seller shall assign to Buyer, at the Closing, all of the right, title and interest of Seller in and to the insurance proceeds awarded or to be awarded to Seller as the result of such damage or destruction giving Buyer a credit at Closing for any deductible under the insurance policy, less any amounts paid for restoration.

  An "Immaterial" part of the Property shall be deemed to have been damaged or destroyed if the cost of repair or replacement thereof shall be $250,000, or less, and a "Material" part thereof shall be deemed to have been damaged or destroyed if the cost of repair or replacement thereof shall be greater than $250,000.

## ARTICLE VI

## SELLER'S COVENANTS

**Section 6.1.   Operation of Property.**  From the Effective Date through the Closing Date, Seller shall cause the Property, and the Improvements, to be maintained in substantially the same manner as prior to the date of this Agreement pursuant to Seller's normal course of business, subject to reasonable wear.

**Section 6.2.   Maintenance of Insurance.**   Seller shall keep and maintain its customary property insurance policies covering the Property in full force and effect until the Closing (provided, however, that the terms of any such coverage maintained in blanket form may be modified as Seller deems necessary).

**Section 6.3.   Notices.**   Seller shall promptly provide Buyer with a copy of any written notice, citation, complaint or other directive from any person, entity or governmental authority received after the Effective Date whereby compliance with any applicable law is called into question.

**Section 6.4.   No Service Contracts.**  Seller shall not enter into any service contracts with regard to the Property.

**Section 6.5.   No Leases.**  Seller shall not enter into any lease or other occupancy agreement for all or any portion of the Property.

**Section 6.6.   No Other Agreements.**  Seller shall not enter into any new license, franchise, concession, easement or any other agreement affecting the Property.

**Section 6.7.   Zoning.**   Without the consent of Buyer, Seller shall not initiate, consent to, approve or otherwise take any action with respect to the zoning or any other governmental rule or regulation applicable to all or any portion of the Property.

**Section 6.8.   Pending Litigation.**  Seller will have the litigations pending against Seller numbered 2, 3 and 6 on Schedule 4.1(j) concluded prior to Closing. Seller will have the litigations pending against Seller numbered 7,8 and 9 on Schedule 4.1(j) either concluded prior to Closing or will the necessary sums bonded at Closing. In the event that the pending claim concerning Orange Rockland Utilities is not concluded prior to Closing, Isaac Lefkowitz will indemnify Buyer against such claim. Nothing in this Agreement is intended to require Buyer to assume any obligations under the bankruptcy litigation numbered as 1 on Schedule 4.1(j).

## ARTICLE VII

## CLOSING AND RELATED MATTERS

**Section 7.1.   Buyer's Conditions to Closing.**  Buyer shall not be obligated to proceed with the Closing unless and until each of the following conditions has been either fulfilled or waived in writing by Buyer (it being understood and agreed that certain of the following conditions by their nature or terms are intended to be satisfied at the Closing):

(a)     Seller shall have performed in all material respects all of the covenants and other obligations required to be performed by it on or prior to the Closing under this Agreement;

(b)     all of Seller's representations and warranties contained herein shall be true and correct in all material respects on the Closing Date (other than those representations or warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be accurate as of such date or with respect to such period);

(c)     the Title Company shall be irrevocably committed to issue at Closing a title policy in the form of the Title Policy subject to payment by Buyer of the title premium therefor;

(d)     as of the Closing Date, there shall exist no pending action, suit or proceeding with respect to Seller before or by any court or administrative agency which seeks to restrain or prohibit the consummation of the transactions contemplated hereby; and

(e)     Seller shall have made the closing deliveries provided for and in accordance with Section 7.3.

**Section 7.2.   Seller's Conditions to Closing**.   Seller shall not be obligated to proceed with the Closing unless and until each of the following conditions has been either fulfilled or waived in writing by Seller (it being understood and agreed that certain of the following conditions by their nature or terms are intended to be satisfied at the Closing):

(a)     Buyer shall have performed in all material respects all of the covenants and other obligations required to be performed by it on or prior to the Closing under this Agreement, including payment of the full balance of the Purchase Price in accordance with the terms hereof;

(b)     all of Buyer's representations and warranties contained herein shall be true and correct in all material respects on the Closing Date;

(c)     as of the Closing Date, there shall exist no pending action, suit or proceeding with respect to Buyer before or by any court or administrative agency which seeks to restrain or prohibit, or to obtain damages with respect to, this Agreement or the consummation of the transactions contemplated hereby; and

(d)     Buyer shall have made the closing deliveries provided for and in accordance with Section 7.3.

**Section 7.3.   Closing Deliveries.**

(a)     At least one (1) business day before the Closing Date, Seller shall deposit into escrow with the Title Company (or as otherwise agreed between Seller and Buyer) the following items, which the Title Company (or such other person as agreed by Seller and Buyer) shall deliver to Buyer at the Closing on the Closing Date:

17

(i)       A statutory form of bargain and sale deed without covenant against grantor's acts, with the covenant required by Section 13 of the Lien Law of New York State, executed with the appropriate acknowledgment form and otherwise in proper form for recording so as to convey title to the Property as required by this Agreement.  The delivery of the deed by Seller, and the acceptance by Buyer, shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed pursuant to this Agreement, except those obligations of Seller which are expressly stated in this Agreement to survive the Closing.

(ii)      Counterparts of any required transfer tax returns, or in each instance and if available, an electronic filing of such returns, together with the required payment of applicable transfer taxes, pursuant to the requirements of the applicable state and local taxing authorities; notwithstanding the foregoing, however, at Seller's option, Seller may elect to allow Buyer a credit against the Purchase Price for the amount of transfer taxes due and payable by Seller and to have Buyer make the timely payment directly to the taxing authorities or provide payment for such amounts to the Title Company and Buyer shall provide Seller with proof of payment at the Closing.

(iii)     A bill of sale whereby Seller conveys to Buyer all of Seller's right, title, and interest in and to the Personal Property, equipment, and other tangible property included in this sale.  The bill of sale will be delivered without any Seller representations or warranties except as to title.

(iv)     All Service Contracts in Seller's possession which are in effect on the Closing Date and are assignable by Seller.

(v)      An assignment to Buyer, without recourse or warranty, of all of the interest of Seller in the Service Contracts.

(vi)     A certification that Seller is not a "foreign person" as such term is defined in Section 1445 of the Internal Revenue Code, as amended and the regulations thereunder, which certification shall be signed under penalty of perjury.

(vii)    Originals, or copies certified by Seller as being complete, of all applicable bills, invoices, fuel readings, and other items that shall be apportioned as of the Closing Date.

(viii)   An original title affidavit in a form reasonably acceptable to Seller and the Title Company.

(ix)     A counterpart of a closing statement jointly prepared by Seller and Buyer reflecting the prorations and adjustments required under Article VIII of this Agreement and the balance of the Purchase Price due Seller.

(x)      All keys and access codes to any portion of the Property, including all units and locked areas, to the extent in Seller's possession or control.

(xi)   A certificate confirming that all representations and warranties made in the Agreement remain true in all material respects as of the Closing Date.

(xii)   A resolution from Seller duly authorizing Seller's actions under this Agreement.

(xiii)   All other documents reasonably necessary or otherwise required by the Title Company to consummate the transaction contemplated by this Agreement.

(b)   On the Closing Date, Buyer shall deposit into escrow with the Title Company the following items, which the Title Company shall deliver to Seller (or as otherwise provided below in this Section 7.3(b)) at the Closing:

(i)   immediately available funds necessary to close this transaction, including (A) the Purchase Price (less the Deposit) and (B) funds sufficient to pay Buyer's share of the closing costs and the prorations;

(ii)   a duly signed certification of Buyer in respect of the matters referred to in Section 7.2(b); and

(iii)   signed counterparts of any other documents which require Buyer's signature reasonably requested by Seller and/or Title Company to consummate the transaction contemplated by this Agreement.

(c)   Seller and Buyer shall each execute and deposit with Title Company the Closing Statement (as hereinafter defined) and such transfer tax declarations and other instruments as are reasonably required by the Title Company or otherwise required to close the escrow and consummate the acquisition of the Property by Buyer in accordance with the terms hereof.  Seller and Buyer hereby designate Escrow Agent as the "Reporting Person" for the transaction pursuant to Section 6045(e) of the Internal Revenue Code of 1986, as amended and the rules and regulations promulgated thereunder (collectively, the "Code") and agree to execute such documentation as is reasonably necessary to effectuate such designation.

**Section 7.4.   Other Closing Deliveries**.  On the Closing Date, Seller shall deliver to Buyer the following: (i) records and files, which are in Seller's or control and are not proprietary or confidential, relating to the current operation and maintenance of the Property: and (ii) all plans and specifications for the Improvements.

## ARTICLE VIII

## PRORATIONS AND APPORTIONMENT OF CLOSING COSTS.

**Section 8.1.   General**.  The following shall be apportioned as of 11:59 p.m. of the date immediately preceding the Closing Date, unless expressly provided for otherwise:

19

    (a)    All real estate taxes and business improvement district charges based on the fiscal year for which they are assessed and any assessments. If the Closing shall occur before a new tax rate is fixed, the apportionment of real estate taxes shall be upon the basis of the tax rate for the preceding fiscal period applied to the latest assessed valuation. If the Property shall be, or has been, affected by any assessments or special assessments payable in a lump sum or which are, or may become, payable in installments, of which the first installment is then a charge or lien, or has already been paid, then at the Closing such amounts will be paid or apportioned, as the case may be in the following manner:

    (i)    any such assessments or installments, or portion thereof, payable on or after the Closing Date shall be the responsibility of Buyer; and

    (ii)    any such assessments or installments, or portion thereof, payable prior to the Closing Date shall be the responsibility of Seller.

    (b)    All water and sewer charges based on the fiscal year for which they are assessed, unless the meters are read on the date immediately preceding the Closing Date;

    (c)    Utilities, fuel, gas, and electric charges based on most recently issued bills, unless the meters are read on the date immediately preceding the Closing Date;

    (d)    Charges and revenues arising out of Service Contracts which are not terminated as of the Closing Date in accordance with this Agreement shall be prorated between Seller and Buyer; and

    (e)    All other items customarily apportioned in connection with sales of property substantially similar to the Property in the State of New York and County of Rockland.

    (f)    <u>Reproration</u>. If any item subject to proration or adjustment cannot be determined on the Closing Date (the "Post-Closing Adjustments"), an estimate shall be made by Seller and Buyer, acting reasonably, for purposes of Closing and a final adjustment shall be made when the particular item can be determined and finalized. In each case when a Post-Closing Adjustment is determined, Seller or Buyer, as the case may be, shall within 30 days of determination, provide a complete statement thereof, together with particulars relating thereto in reasonable detail, to the other and within 30 days thereafter the parties hereto shall make a final adjustment as of the Closing Date for the Post-Closing Adjustment in question. In the case of any dispute between the parties hereto with respect to any Post-Closing Adjustments, the final amount of such Post-Closing Adjustments shall be determined by auditors jointly appointed by Buyer and Seller, and the cost of such determination shall be shared equally between Seller and Buyer. Any party may refer any such dispute to such auditors for such determination and such determination shall be final and binding on the parties hereto. All Post-Closing Adjustments shall be completed by the date that is six (6) months following the Closing Date (the "Adjustment Period"), provided that such date may be extended up to an additional six (6) months (the "Adjustment Extension Period") to the extent necessary to make a final determination of a Post- Closing Adjustment. No claim for any re-adjustment may be made by any party after the expiration

of the Adjustment Period, or, if applicable, the Adjustment Extension Period, for the specific adjustment.

      (g)    <u>Cooperation</u>. Seller and Buyer shall each provide to the other and its auditors, during normal business hours at any time and from time to time after Closing upon reasonable prior notice, access to their respective books, files and records relating exclusively to the Property, for the purpose of calculating or verifying the amount of any Adjustments or Post-Closing Adjustments.

**Section 8.2.   Closing Statement**.  At least five (5) business days prior to the Closing Date, Seller shall deliver to Buyer (for Buyer's approval) and the Title Company a closing statement prepared by Seller in accordance with the provisions hereof setting forth the proration adjustments as of the Closing Date (the "Closing Statement").  Any errors in the preparation thereof to the extent not corrected prior to Closing shall be corrected after the Closing.

**Section 8.3.   Closing Costs**.

      (a)    Seller and Buyer shall each pay the fees and expenses of its own counsel in connection with the preparation and negotiation of this Agreement.  The deed and other agreements and instruments related to the transaction contemplated by this Agreement and such legal costs shall not be part of the closing costs; provided, however, that if any legal action is instituted under this Agreement, the prevailing party in such action shall be entitled to recover from the other party costs related to such legal action, including reasonable attorneys' fees and costs in all trial, appellate, post-judgment, and bankruptcy proceedings.

      (b)    Seller shall pay:

          (i)    all transfer taxes for the State of New York payable in connection with the transaction contemplated by this Agreement;

          (ii)    the commission owed to the Broker, if any, pursuant to Article IX of this Agreement; and

          (iii)    all recording fees for the release of any liens on the Property, as required pursuant to the terms of this Agreement.

      (c)    Buyer shall pay:

          (i)    the costs charged by the Title Company, including, without limitation, costs related to the Title Commitment and Title Policy, any premiums, title endorsements, and affirmative insurance;

          (ii)    the costs related to the Buyer's Survey and any other survey or survey update;

(iii)    any other fees or costs related to Buyer's due diligence reviews; and

(iv)    all costs related to the recording fees payable in connection with the recording of the deed and Buyer's lender's security instruments, if any, including any mortgage tax.

**Section 8.4.   Survival**.  The provisions of this Article VIII shall survive the Closing.

## ARTICLE IX

## BROKERS AND EXPENSES

**Section 9.1.   Brokers**.  Each of Seller and Buyer represent and warrant to the other that it has not had any contact or dealings regarding the Property, or any communication in connection with the subject matter of this transaction, through any real estate broker or other person who can claim a right to a commission or finder's fee in connection with the sale contemplated herein other than, CBRE (the "Broker").  All commissions payable to the Broker in connection with this transaction shall be paid by Seller.   In the event that any broker or finder makes a claim for a commission or finder's fee based upon any contact, dealings or communication, the party whose conduct is the basis for the broker or finder making its claim shall indemnify, defend and hold harmless the other party against and from any commission, fee, liability, damage, cost and expense, including attorneys' fees, arising out of or resulting from any such claim. Such obligations shall survive the Closing or the earlier termination of this Agreement.

## ARTICLE X

## REMEDIES

**Section 10.1.   Buyer's Remedies.**

(a)    If (i) Seller shall default in the observance or performance of any of the terms of this Agreement, and Buyer is ready, willing, and able to close in accordance with the terms, provisions, and conditions of this Agreement and the Closing does not occur as a result thereof Buyer's sole and exclusive remedy shall be to (i) receive the Deposit plus any accrued interest thereon or (ii) institute an action for specific performance of this Agreement. Notwithstanding anything to the contrary contained in this Agreement, in no event shall Seller be liable to Buyer for any damages of any kind whatsoever, unless Seller's actions or inactions render Buyer's right to specific performance impossible (i.e., such as Seller's sale of the Property to another buyer), in which event there shall be no limit whatsoever on Seller's liability to Buyer..

(b)    If Buyer shall default in the observance or performance of Buyer's obligations under this Agreement and the Closing does not occur as a result thereof (a "Buyer Default"), Seller's sole and exclusive remedy shall be to retain the Deposit plus any accrued interest thereon, if any, as and for full and complete liquidated and agreed damages

for Buyer's Default, and the parties shall be released from further liability to each other hereunder, except for those obligations and liabilities that are expressly stated to survive termination of this Agreement. SELLER AND BUYER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES WHICH SELLER MAY SUFFER UPON A BUYER DEFAULT AND THAT THE DEPOSIT AND ANY INTEREST EARNED THEREON, AS THE CASE MAY BE, REPRESENTS A REASONABLE ESTIMATE OF THE TOTAL NET DETRIMENT THAT SELLER WOULD SUFFER UPON A BUYER DEFAULT. SUCH LIQUIDATED AND AGREED DAMAGES ARE NOT INTENDED AS A FORFEITURE OR A PENALTY WITHIN THE MEANING OF APPLICABLE LAW.

(c)     Upon the release of the Deposit, and any interest accrued thereon, to either Buyer or Seller, as the case may be, this Agreement shall be deemed null and void and no party hereto shall have any obligations to, or rights against, the other hereunder, except as expressly provided herein.

(d)     The provisions of this Article X shall survive the Closing or termination of this Agreement.

**Section 10.2.   Cure Period**.   Prior to declaring a default hereunder, the non-defaulting party shall first provide the defaulting party with five (5) days prior written notice and the defaulting party shall have an opportunity to cure such default for a period not exceeding 15 days from the expiration of such five (5) day default notice period. No such cure period shall apply to the parties' respective deliveries under Section 7.3.

## ARTICLE XI

## CONDITION OF PROPERTY

**Section 11.1.   NO SIDE AGREEMENTS OR REPRESENTATIONS; AS-IS PURCHASE**.   NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, EXCEPT FOR THE SPECIFIC REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT, SELLER SPECIFICALLY DISCLAIMS ALL WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE (INCLUDING WARRANTIES OF MERCHANTABILITY AND WARRANTIES OF FITNESS FOR USE OR ACCEPTABILITY FOR THE PURPOSE INTENDED BY BUYER) WITH RESPECT TO THE PROPERTY OR THE PROPERTY'S CONDITION OR THE CONSTRUCTION, PROSPECTS, OPERATIONS OR RESULTS OF OPERATIONS OF THE PROPERTY. THE DISCLAIMERS HEREOF SPECIFICALLY EXTEND TO, WITHOUT LIMITATION, (1) MATTERS RELATING TO HAZARDOUS MATERIALS AND COMPLIANCE WITH ENVIRONMENTAL LAWS, (2) GEOLOGICAL CONDITIONS, INCLUDING SUBSIDENCE, SUBSURFACE CONDITIONS, WATER TABLE, UNDERGROUND STREAMS AND RESERVOIRS AND OTHER UNDERGROUND WATER CONDITIONS, LIMITATIONS REGARDING THE WITHDRAWAL OF WATER, THE FACT THAT ALL OR A PORTION OF THE PROPERTY MAY BE LOCATED ON OR NEAR AN

EARTHQUAKE FAULT LINE AND MATTERS RELATING TO FLOOD PRONE AREAS, FLOOD PLAIN, FLOODWAY OR SPECIAL FLOOD HAZARDS, (3) DRAINAGE, (4) SOIL CONDITIONS, INCLUDING THE EXISTENCE OF INSTABILITY, CONDITIONS OF SOIL FILL, SUSCEPTIBILITY TO LANDSLIDES, AND THE SUFFICIENCY OF ANY UNDERSHORING, (5) ZONING AND SUBDIVISION AND COMPLIANCE WITH ZONING AND SUBDIVISION LAWS, (6) THE VALUE AND PROFIT POTENTIAL OF THE PROPERTY AND (7) DESIGN, QUALITY, SUITABILITY, STRUCTURAL INTEGRITY AND PHYSICAL CONDITION OF THE PROPERTY AND COMPLIANCE OF THE PROPERTY WITH ANY LAWS (INCLUDING BUILDING CODES AND SIMILAR LAWS, THE AMERICANS WITH DISABILITIES ACT OF 1990 AND THE FAIR HOUSING AMENDMENTS ACT OF 1988). BUYER ACKNOWLEDGES THAT SELLER HAS MADE AVAILABLE TO IT (I) A LIMITED SUBSURFACE INVESTIGATION REPORT FOR THE PROPERTY PREPARED BY ATC ENGINEERING, LLP DATED MARCH 8, 2019, (II) AN ASBESTOS REPORT FOR THE PROPERTY PREPARED BY ENVIRON DATED JANUARY, 2012 AND (III) A WETLANDS DELINEATION REPORT PREPARED BY CAPITAL ENVIRONMENTAL CONSULTANTS, INC. DATED NOVEMBER 8, 2019 ADDRESSED TO THE U.S. ARMY CORPS OF ENGINEERS AS WELL AS A LETTER FROM THE ARMY CORPS OF ENGINEERS RECEIVED BY CAPITAL ENVIRONMENTAL CONSULTANTS ON JANUARY 10, 2020. BUYER REPRESENTS AND WARRANTS TO SELLER THAT BUYER IS A KNOWLEDGEABLE, EXPERIENCED AND SOPHISTICATED BUYER OF REAL ESTATE.   BUYER ACKNOWLEDGES THAT, EXCEPT FOR THE SPECIFIC REPRESENTATIONS AND WARRANTIES MADE BY SELLER HEREIN, BUYER HAS NOT RELIED UPON AND WILL NOT RELY UPON, EITHER DIRECTLY OR INDIRECTLY, ANY STATEMENT OF SELLER, ANY OF ITS OWNERS, MEMBERS, PARTNERS (LIMITED OR GENERAL) OR AFFILIATES OR ANY OFFICER, DIRECTOR, TRUSTEE, AGENT, EMPLOYEE, ATTORNEY OR OTHER PERSON ACTING OR PURPORTING TO ACT ON BEHALF OF ANY SUCH PERSON.  BUYER ACKNOWLEDGES THAT IT HAS CONDUCTED OR WILL CONDUCT SUCH INSPECTIONS AND INVESTIGATIONS AS TO THE CONDITION OF THE PROPERTY AND ALL MATTERS BEARING UPON THE PROPERTY AND THE CONSTRUCTION, PROSPECTS, OPERATIONS AND RESULTS OF OPERATIONS OF THE PROPERTY AS IT DEEMS NECESSARY TO PROTECT ITS INTERESTS.   EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, BUYER IS ACCEPTING THE PROPERTY "AS IS" AND "WHERE IS" AND WITH ALL FAULTS, DEFECTS OR OTHER ADVERSE MATTERS. EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, UPON CLOSING, BUYER WILL ACCEPT THE PROPERTY SUBJECT TO ADVERSE STRUCTURAL, PHYSICAL, ECONOMIC OR ENVIRONMENTAL CONDITIONS THAT MAY THEN EXIST AND THAT WERE NOT REVEALED BY THE INSPECTIONS AND INVESTIGATIONS CONDUCTED BY BUYER, AND EXCEPT AS PROVIDED IN THIS AGREEMENT, BUYER SPECIFICALLY WAIVES AND RELEASES  ALL WARRANTIES, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE (INCLUDING WARRANTIES OF MERCHANTABILITY AND WARRANTIES OF FITNESS FOR USE OR ACCEPTABILITY FOR THE PURPOSE INTENDED BY

SELLER) WITH RESPECT TO THE PROPERTY AND ITS CONDITION AND THE CONSTRUCTION, PROSPECTS, OPERATIONS OR RESULTS OF OPERATIONS OF THE PROPERTY. BUYER ACKNOWLEDGES AND AGREES THAT THE DISCLAIMERS, WAIVERS AND RELEASES SET FORTH IN THIS ARTICLE XI ARE AN INTEGRAL PART OF THIS AGREEMENT AND THAT SELLER WOULD NOT HAVE AGREED TO COMPLETE THE SALE ON THE TERMS PROVIDED IN THIS AGREEMENT WITHOUT THE DISCLAIMERS, WAIVERS AND RELEASES SET FORTH IN THIS ARTICLE XI. NOTWITHSTANDING THE FOREGOING, NO RELEASE CONTAINED IN THIS ARTICLE XI SHALL APPLY TO SELLER'S OBLIGATIONS HEREUNDER WHICH EXPRESSLY SURVIVE CLOSING OR TO FRAUD. THE PROVISIONS OF THIS ARTICLE XI SHALL SURVIVE CLOSING OR ANY EARLIER TERMINATION OF THIS AGREEMENT.

## ARTICLE XII
## LIMITED LIABILITY; INDEMNIFICATION.

**Section 12.1.  Limited Recourse**.  The obligations of Seller under this Agreement and under all of the documents executed by Seller in connection herewith are intended to be binding only on the property of Seller and shall not be personally binding upon, nor shall any resort be had to, Seller's members, officers, directors, agents or affiliates.  The obligations of Buyer under this Agreement and under all of the documents executed by Buyer in connection herewith are intended to be binding only on the property of Buyer and shall not be personally binding upon, nor shall any resort be had to, Buyer's members, officers, directors, agents or affiliates.

**Section 12.2.  Survival**.  It is expressly understood and agreed by and between the parties hereto that, in the event the Closing hereunder occurs, the sole and exclusive recourse of Buyer and its successors and assigns with respect to any breach by or on the part of Seller of any representation or warranty made by Seller in this Agreement (collectively, "Seller's Representations and Warranties") shall (x) be deemed irrevocably waived, except to the extent Buyer has delivered to Seller written notice that Buyer is seeking recourse with respect to a breach or alleged breach of Seller's Representations and Warranties (the "Recourse Notice") after the Closing Date and prior to the date that is ninety (90) days from the Closing Date, which Recourse Notice specifies in reasonable detail the facts and circumstances relating to such alleged breach the estimated damages (or actual damages, if known), losses, reasonable out-of-pocket costs and expenses and other liabilities (collectively "Losses"), as applicable, suffered or incurred or anticipated to be suffered or incurred by Buyer as a result of such breach and (y) be limited to the recourse provided for in this Section 12.2. Notwithstanding anything to the contrary in this Agreement, (i) Seller shall not be liable for any breach of any of the Seller's Representations and Warranties where the Losses incurred or suffered by Buyer with respect to a claim arising as a result of such breach is less than Fifty Thousand Dollars ($50,000), (ii) Seller's liability under this Agreement in respect of any breaches of Seller's Representations and Warranties shall be limited to an amount not to exceed One Million Dollars ($1,000,000.00) in the aggregate, (iii) in no event shall Seller be liable for, nor shall Buyer have any right to claim from Seller, any indirect, consequential, special, exemplary, incidental, or punitive damages or Losses (including any Losses on account of lost profits or diminution of value) and (iv) Seller shall

not be liable for any breach of any of the Seller's Representations and Warranties if Buyer had actual knowledge of such breach prior to the Closing and elected to close with such knowledge. For purposes hereof, the "actual knowledge" of Buyer shall be deemed to include (i) all of the information contained in the Due Diligence Materials, materials furnished to Buyer by the Seller and third party reports prepared for Buyer and (ii) the actual knowledge of Adam Mermelstein.

**ARTICLE XIII**
**MISCELLANEOUS**

**Section 13.1.   Notices**.   Any notice, consent, approval or communication given pursuant to the provisions of this Agreement shall (except where otherwise permitted by this Agreement) be in writing, addressed as described below and shall be: (a) delivered by hand; (b) mailed by certified mail or registered mail, return receipt requested, postage prepaid; (c) delivered by a nationally recognized overnight courier, U.S. Post Office Express Mail, or similar overnight courier which delivers only upon signed receipt of the addressee; or (d) delivered by email. The time of the giving of any notice shall be the time of receipt thereof by the addressee delivered by facsimile or any agent of the addressee, except that in the event the addressee or such agent of the addressee shall refuse to receive any notice given as above provided or there shall be no person available at the time of delivery thereof to receive such notice, the time of the giving of such notice shall be the time of such refusal.  Such notices shall be given to the parties hereto at the following addresses:

|  |  |
|---|---|
| To Seller: | Suffern Partners LLC |
|  | 351 Spook Rock Road |
|  | Suffern, New York 10901 |
|  | Attention:   David Gefner |
|  | Tel No.:   845 659 6104 |
|  | E-mail:   dg@perigrove.com |

with a copy (which shall not constitute notice) to:

Hahn & Hessen LLP
488 Madison Avenue
New York, New York 10022
Attention:   Mark D. Graham, Esq.
Tel No.:   212 478 7215
E-mail:   mgraham@hahnhessen.com

|  |  |
|---|---|
| To Buyer: | IT HOLDER ENTITY LLC |
|  | The Glenpointe Centre West |
|  | 500 Frank W. Burr Boulevard #477 |
|  | Teaneck, New Jersey 07666 |
|  | Attention:   Adam Mermelstein |
|  | Tel No.:   973 622 0073 |
|  | Email:   amermelstein@treetopdev.com |

with a copy (which shall not constitute notice) to:

Greenberg Traurig LLP
500 Campus Drive, Suite 400
Florham Park, New Jersey 07932
Attention:    Steven D. Fleissig, Esq.
Tel No.:    (973) 433-3281
Email:    fleissig@gtlaw.com

or to such other address as either party may from time to time specify in writing to the other party. Any notice shall be effective only upon delivery.

**Section 13.2.   Entire Agreement**. This Agreement, together with the Exhibits and Schedules hereto and thereto, contain the entire understanding between the parties hereto with respect to the subject matter hereof. Any prior correspondence, memoranda or agreements are replaced in total by this Agreement together with the Exhibits and schedules hereto.

**Section 13.3.   Time of the Essence**. Time is of the essence in the performance of each of the parties' respective obligations contained herein. Notwithstanding the foregoing, wherever a date specified herein falls on a day other than a business day, such date shall be deemed to be the next business day.

**Section 13.4.   Assignment**. Buyer's rights and obligations under this Agreement shall not be assignable without the prior written consent of Seller in Seller's sole discretion. Notwithstanding the foregoing, Buyer shall have the right, without the necessity of obtaining Seller's consent provided Buyer gives Seller prior written notice accompanied by the fully executed assignment at least five (5) business days before the Closing Date, to assign its right, title and interest in and to this Agreement to an entity owned in whole or part by Buyer or to any persons or entities that own a direct or indirect interest in Buyer or a subsidiary of such persons or entity, provided that prior to Closing Buyer shall not be released from any of its obligations or liabilities hereunder in connection with any such assignment, but shall be released from liability thereafter, and provided further that the assignee shall assume all of Buyer's obligations hereunder. Subject to the provisions of this Section 12.4, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

**Section 13.5.   Counterparts; Facsimile; Electronic Signatures**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. This Agreement may be executed by facsimile or electronic signature. Any facsimile or electronic signature shall be treated as an original signature for all purposes.

**Section 13.6.   Governing Law; Jurisdiction**.

(a)    This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

27

(b)     Seller and Buyer consent to the jurisdiction of any state or federal court located within the State of New York, and irrevocably agree that all proceedings arising out of or relating to this Agreement shall be litigated in such courts. Each of Seller and Buyer accept the jurisdiction of the courts located within Rockland County, State of New York, and waive any defense of forum non conveniens, and irrevocably agree to be bound by any judgment rendered against it in connection with this Agreement or any matter arising out of or relating to any of the foregoing.

**Section 13.7.   Interpretation of Agreement**.   The article, section and other headings of this Agreement are for convenience of reference only and shall not be construed to affect the meaning of any provision contained herein.  Where the context so requires, the use of the singular shall include the plural and vice versa and the use of the masculine shall include the feminine and the neuter.  The term "person" or "Person" shall include any individual, partnership, joint venture, corporation, trust, unincorporated association, any other entity and any government or any department or agency thereof, whether acting in an individual, fiduciary or other capacity.  Unless the context of this Agreement otherwise requires, the word "includes" and its derivatives means "including without limitation" and corresponding derivative expressions.  If any action under this Agreement is required to be done or taken on a day that is not a business day, then such action shall be required to be done or taken not on such day but on the first succeeding business day thereafter.  Unless the context of this Agreement otherwise requires, whenever in this Agreement a person is permitted or required to make a decision (including a decision that is in such person's "discretion" or under a grant of similar authority or latitude), such decision shall be made in such person's sole and absolute discretion and such person shall be entitled to consider only such interests and factors as such person desires.

**Section 13.8.   Amendments**.  This Agreement may be amended or modified only by a written instrument signed by Buyer and Seller.

**Section 13.9.   No Recording**.  Neither this Agreement nor any memorandum or short form thereof may be recorded by Buyer except as required by law to file an action for specific performance by Buyer.

**Section 13.10.  Drafts Not an Offer to Enter Into a Legally Binding Contract**.  The parties hereto agree that the submission of a draft of this Agreement by one party to another is not intended by either party to be an offer to enter into a legally binding contract with respect to the purchase and sale of the Property.  The parties shall be legally bound with respect to the purchase and sale of the Property pursuant to the terms of this Agreement only if and when the parties have been able to negotiate all of the terms and provisions of this Agreement in a manner acceptable to each of the parties in their respective sole discretion, and both Seller and Buyer have fully executed and delivered to each other a counterpart of this Agreement.

**Section 13.11.  No Partnership**.  The relationship of the parties hereto is solely that of seller and buyer with respect to the Property and no joint venture or other partnership exists between the parties hereto.  Neither party has any fiduciary relationship hereunder to the other.

**Section 13.12.  No Third Party Beneficiary**.  The provisions of this Agreement are not intended to benefit any third parties and no third party shall be deemed a beneficiary hereof.

**Section 13.13.  Survival**.  No representations, warranties, covenants or agreements of Seller or Buyer contained herein shall survive the Closing, except as otherwise provided herein.

**Section 13.14.  Jury Waiver**.  BUYER AND SELLER, TO THE EXTENT THEY MAY LEGALLY DO SO, DO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THEIR RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, OR UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE DOCUMENTS DELIVERED BY BUYER OR BY SELLER AT CLOSING, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ANY ACTIONS OF EITHER PARTY ARISING OUT OF OR RELATED IN ANY MANNER WITH THIS AGREEMENT, THE PROPERTY (INCLUDING ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT AND ANY CLAIMS OR DEFENSES OTHERWISE VOID OR VOIDABLE).  TO THE EXTENT THEY MAY LEGALLY DO SO, SELLER AND BUYER HEREBY AGREE THAT ANY SUCH LITIGATION SHALL BE DECIDED BY A COURT TRIAL WITHOUT A JURY AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 13.14 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE OTHER PARTY OR PARTIES HERETO TO WAIVER OF ITS OR THEIR RIGHT TO TRIAL BY JURY.  THIS WAIVER IS A MATERIAL INDUCEMENT FOR SELLER TO ENTER INTO AND ACCEPT THIS AGREEMENT AND THE DOCUMENTS DELIVERED BY BUYER AT CLOSING AND SHALL SURVIVE THE CLOSING OR TERMINATION OF THIS AGREEMENT.

**Section 13.15.  Confidentiality**. Buyer covenants and agrees not to communicate: (a) the terms or any aspect of this Agreement and the transactions contemplated hereby; and (b) the content of any and all information in respect of the Property which is supplied by Seller to Buyer (collectively, the "Confidential Information") to any person or entity, without the express written consent of Seller; provided, however, that Buyer may, without consent, disclose the Confidential Information: (i) to its respective advisors, consultants, attorneys, accountants, partners, investors, and lenders (the "Transaction Parties") without the express written consent of Seller, so long as any such Transaction Parties to whom disclosure is made shall also agree to keep all such information confidential in accordance with the terms hereof; and (ii) if disclosure is required by law or by regulatory or judicial process or pursuant to any regulations promulgated by the New York Stock Exchange or other public exchange for the sale and purchase of securities, provided that in such event Buyer shall notify the Seller in writing of such required disclosure, shall exercise all commercially reasonable efforts to preserve the confidentiality of the Confidential Information, including, without limitation, reasonably cooperating with the other party to obtain an appropriate order or other reliable assurance that confidential treatment will be accorded such Confidential Information by such tribunal and shall disclose only that portion of the Confidential Information which it is legally required to disclose.  The foregoing

confidentiality obligations shall not apply to the extent that any such Confidential Information is a matter of public record or is provided in other sources readily available to the real estate industry other than as a result of disclosure by Buyer or its Transaction Parties. Buyer hereby indemnifies Seller against, and holds Seller harmless from, any and all claims, losses, damages, liabilities, and expenses (including, without limitation, reasonable attorneys' fees and disbursements) arising in connection with Purchaser's obligations under this Section 13.15 and/or the disclosure of any Confidential Information by Buyer and/or by Buyer's Transaction Parties in violation of this Section 13.15 In the event that Buyer breaches it obligation under this Section 13.15, Escrow Agent shall immediately deliver the Deposit to Seller and Seller may, at its option, terminate this Agreement. The provisions of this Section 13.15 shall survive the Closing or the earlier termination of this Agreement.

**Section 13.16. Return or Destruction of Confidential Information**.  As of the Closing Date or in the event of a termination of this Agreement, if applicable, such confidentiality shall be maintained by Purchaser and all Confidential Information in accordance with the written request of Seller shall be either promptly: (a) returned to Seller; or (b) destroyed by Buyer, with any such destruction confirmed by Buyer and its Transaction Parties in writing.

**Section 13.17. Survival of Article XIII**.  The provisions of this Article XIII shall survive the Closing or the earlier termination of this Agreement.

## ARTICLE XIV

## ESCROW PROVISIONS

**Section 14.1.    Escrow Provisions**.  The Deposit shall be held by the Escrow Agent in trust and shall be deposited in an interest bearing accounts insured by the FDIC. The execution of this Agreement by the Escrow Agent is solely for purposes of evidencing the acknowledgment by the Escrow Agent of the receipt by it of the Deposit and other terms hereof in which the Escrow Agent is specifically referenced.  The Escrow Agent shall not charge for its services as Escrow Agent hereunder.

**Section 14.2.    Acknowledgments of Parties.**

(a)    Upon disbursing the Deposit, the Escrow Agent shall have no further obligation with respect to the Deposit.

(b)    Buyer, Seller and the Escrow Agent acknowledge that the Escrow Agent is acting hereunder as a depository only to the parties except as described herein.

(c)    All parties agree the Escrow Agent shall not be liable to any party or person whomsoever for: (i) the sufficiency, correctness, genuineness or validity of any instrument deposited with it or any notice or demand given to it or for the form of execution of such instrument, notice or demand, or for the identification, authority or rights of any person executing, depositing or giving the same or for the terms and conditions of any

instrument, pursuant to which the parties may act; (ii) acting upon any signature, notice, demand, request, waiver, consent, receipt or other paper or document believed by the Escrow Agent to be genuine and the Escrow Agent may assume that any person purporting to give it any notice on behalf of any party in accordance with the provisions hereof has been duly authorized to do so; or (iii) otherwise acting or failing to act under this Article XIV except in the case of the Escrow Agent's gross negligence or willful misconduct.

(d)     The Escrow Agent shall not incur any liability in acting upon any signature, notice, request, waiver, consent, receipt or other paper document in good faith believed by it to be genuine.  The Escrow Agent has executed this Agreement solely to confirm that it is holding and will hold the Deposit in escrow pursuant to the provisions of this Article XIV and for no other purpose.

(e)     All interest earned on the Deposit shall inure to the party entitled to receive the Deposit hereunder.

(f)     Escrow Agent shall have the right, but not the obligation, to invest the Deposit in savings accounts, treasury bills, certificates of deposits and/or in other money market instruments approved by Seller, or in funds investing in any of the foregoing, and shall not be liable for any losses suffered in connection with any such investment.

(g)     If the Closing occurs, then Escrow Agent shall deliver the Deposit to Seller.

(h)     If Buyer duly terminates this Agreement pursuant to the terms of Section 2.2, then Escrow Agent shall deliver the Deposit to Buyer.

(i)     If for any reason (other than by reason of a termination by Buyer pursuant to the terms of Section 2.2, the Closing does not occur and either party makes a written demand upon Escrow Agent for payment of the Deposit, Escrow Agent shall give written notice to the other party of such demand. If Escrow Agent does not receive a written objection from the other party to the proposed payment within five (5) days after the giving of such notice, Escrow Agent is hereby authorized to make such payment.  If Escrow Agent does receive such written objection within such five (5) day period, Escrow Agent shall have the right to: (i) hold and retain all or any part of the Deposit until either (x) Seller and Buyer shall have delivered to Escrow Agent a joint written instruction setting forth the manner in which the Deposit is to be paid out and delivered, in which event the Escrow Agent shall deliver the Deposit as set forth in such instructions or (y) there shall have been served upon the Escrow Agent a final, unappealable order or judgment duly entered in a court of competent jurisdiction setting forth the manner in which the Deposit is to be paid out and delivered, in which event the Escrow Agent shall deliver the Deposit as set forth in such order or judgment; or (ii) interplead the Deposit into any court of competent jurisdiction in New York State.

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement as of the date set forth in the first paragraph of this Agreement.

SUFFERN PARTNERS LLC

By:    GOLDMANRX, INC.

By:_____
Name:  Isaac Leikowitz
Title:    President


IT HOLDER ENTITY LLC


By:_____
Name:
Title:

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement as of the date set forth in the first paragraph of this Agreement.

SUFFERN PARTNERS LLC

By:     GOLDMANRX, INC.

By:_____
Name:   Isaac Lefkowitz
Title:   President


IT HOLDER ENTITY LLC

By:_____
Name:
Title:

32

## FIRST AMENDMENT TO
## PURCHASE AND SALE AGREEMENT

This First Amendment to Purchase and Sale Agreement (this "Amendment") is made and entered into effective as of the 21st day of July, 2020 ("Amendment Effective Date") by and between SUFFERN PARTNERS LLC a New York limited liability company ("Seller"), and TT HOLDER ENTITY LLC, a New Jersey limited liability company (mis-named in the Agreement as "IT") ("Buyer").

### WITNESSETH:

WHEREAS, Seller and Buyer heretofore entered into that certain Purchase and Sale Agreement dated March 9, 2020 (the "Agreement"), pursuant to the terms of which Seller agreed to sell and Buyer agreed to buy the real property known as (i) 25 Old Mill Road, Suffern, New York 10901 (Section: 55.22, Block 1, Lot 1), (ii) 19 Hemion Road, Montebello, New York 10901 (Section: 55.6, Block 1, Lot 1) and (iii) Route 59, Suffern, New York 10901 (Section: 55.37, Block 1, Lot 31) each located in Rockland County, New York as more particularly described therein; and

WHEREAS, Seller and Buyer now desire to amend the Agreement as more particularly described below.

NOW, THEREFORE, for and in consideration of the premises, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer hereby agree as follows:

### AGREEMENTS:

1.  All terms which are defined in the Agreement shall have the same meanings when used herein, unless specifically provided herein to the contrary.

2.  Seller and Buyer hereby agree that Section 1.3(a) of the Agreement is hereby amended in its entirety to read as follows:

    (a)  The purchase price to be paid by Buyer to Seller for the Property (the "Purchase Price") is FIFTY-TWO MILLION FIVE HUNDRED THOUSAND DOLLARS ($52,500,000). A portion of the Purchase Price in the amount of $33,900,000 shall be payable through Buyer's assumption of the Assumed Financing as described in 7(f) hereof or by Buyer paying off in full all sums representing the Assumed Financing and the Assumed Mortgage (as hereafter defined). With respect to the allocation of the Purchase Price among the tracts comprising the Property and any tangible personal property included in the sale, Buyer and Seller shall endeavor in good faith to agree on such allocation. In the event that Buyer and Seller are unable to agree on such allocation on or before ten (10) days prior to the then Closing Date, Buyer and Seller shall mutually select in good faith a third party to determine the allocation and such third party's determination shall be conclusive and binding upon the parties. In the

event that Buyer and Seller are not able in good faith to agree upon a third party to determine the allocation on or before five (5) days prior to the then Closing Date, then the Broker shall determine the allocation and such determination shall be conclusive and binding on the parties.

3.      Seller and Buyer hereby agree that Section 1.3(d) of the Agreement is hereby amended in its entirety to read as follows:

(d)      The Purchase Price assumes a $3,500,000 investment in Buyer's purchasing entity by Seller or its designee ("Seller's Investment") which shall be made on before Closing.  Such investment shall be as a "member" with Seller (or its designee) having no different management or voting rights than any of the Buyer's other investors. Management of said entity shall be solely vested in Azi Mandel and/or Adam Mermelstein (directly or indirectly, through one or more entities controlled by them or by any one or more of them) and Seller (or its designee) shall have no management function whatsoever.  If, for any reason, Seller or its designee fails to satisfy the requirement of investing said $3,500,000 in the Buyer's purchasing entity (other than by reason of Buyer's refusal to permit Seller to remove equipment and fixtures from the Property which constitute "Excluded Assets"), the Purchase Price shall be reduced by $2,500,000 to $50,000,000.

4.      Seller and Buyer hereby agree that Section 1.4 of the Agreement is hereby amended in its entirety to read as follows:

1.4      **Closing**.  The Closing for the sale of the Property pursuant to the terms of this Agreement shall take place in escrow with the Title Company (as hereafter defined) or as otherwise mutually agreed at or before 5:00 P.M. EDT August 27, 2020 (the "Closing Date").  In the event that Seller is not able to satisfy the conditions set forth in Section 3.1 (c) and (d) or Section 6.8 or is unable to arrange for the Assumed Financing (as hereafter defined) as of the Closing Date, the Closing Date shall be extended for a period until Seller is able to satisfy the foregoing conditions and arrange for the Assumed Financing. Notwithstanding the foregoing,  if Seller is unable to accomplish all of the foregoing within six (6) months of the Amendment Effective Date, then Seller or Buyer can terminate the Agreement on notice to the other, in which event the Deposit shall be returned to Buyer and the Agreement shall be null and void except for those provisions which, by their terms, survive termination of the Agreement.

5.      Seller and Buyer hereby agree that with reference to Section 2.2 of the Agreement, (i) the Due Diligence Period is deemed expired as of the Amendment Effective Date, (ii) Buyer shall have no further right to terminate the Agreement pursuant to the terms of Section 2.2 and (iii) this Amendment shall become effective only upon delivery by wire transfer of the Additional Deposit by Buyer to Escrow Agent.  Notwithstanding the expiration of the Due Diligence Period, the effect of Buyer's Notice dated April 21, 2020 and Seller's Cure Response thereto dated April 24, 2020 shall remain in place.

2

6.    Seller and Buyer agree that Section 3.1(c) of the Agreement is hereby amended to insert after the work "mortgages" on the third line thereof the following parenthetical

(other than in respect to the Assumed Financing, as hereafter defined)

7.    Seller and Buyer hereby agree that Article VI of the Agreement is hereby amended to add a Section 6.9 as follows:

6.9   **Certiorari Claims**. Seller agrees not to settle any certiorari claims with respect to real estate taxes due on the Property for the year 2019, 2020 or any subsequent year without Buyer's consent.

8.    Seller and Buyer hereby agree that Section 7.1 of the Agreement is hereby amended to add the following subsections (f) and (g):

(f)    Seller shall have arranged for Buyer to assume an indebtedness in the amount of $33,900,000 (the "Assumed Financing") to CPIF Lending, LLC ("CPIF") secured in part by that certain Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated September 6, 2017 made by Seller and North 14th Street Realty Associates LLC in favor of CPIF in the original principal amount of $33,000,000 as the same may be amended, restated, modified or substituted for (the "Assumed Mortgage"). The Assumed Financing shall contain the following terms notwithstanding any contrary terms on the documents currently evidencing such loan: (i) the term of the Assumed Financing shall be for a period of eighteen months from the Closing Date; (ii) the Assumed Financing will bear interest at a rate of six and nine-tenths percent (6.9%) per annum; (iii) Buyer shall prepay at Closing to CPIF an interest reserve for interest payment due and owing for the eighteen (18) month term of the Assumed Financing in the amount of $3,508,650. Buyer's assumption of the Assumed Financing shall represent $33,900,000 of the Purchase Price and (v) shall contain such terms and conditions as are typically set forth in a loan assumption transaction.

(g)    As part of the Assumed Financing, each of Azi Mandel and Adam Mermelstein on Buyer's behalf and each of David Gefner and Isaac Lefkowitz on Seller's behalf shall personally and jointly and severally indemnify and save the other party harmless from any loss or damage from a breach of the Assumed Mortgage or other loan documents relating to the Assumed Financing as it relates to that portion of the mortgaged premises not owned by the affiliate of the indemnifying persons. Said cross-indemnity shall be further evidenced by a cross- indemnity agreement to be negotiated in good faith by the parties and their counsel prior to the Closing Date.

9.    Seller and Buyer hereby agree that Article VII of the Agreement is hereby amended to add a Section 7.3 as follows:

7.3   **Drop and Swap**. Notwithstanding anything herein to the contrary, Seller, at the request of, and at the sole expense of, Buyer (such request to be made no later than five (5) business days prior to the Closing Date), shall create one or more subsidiaries

3

or affiliates pursuant to formation documents prepared by Buyer and approved by Seller, and, at Closing (i) Seller shall transfer, assign and convey to such subsidiary or affiliate, by deed, the Property and immediately thereafter (ii) assign all of Seller's membership interests in such subsidiary or affiliate to Buyer pursuant to an assignment agreement prepared by Buyer and reasonably approved by Seller, provided, however, that none of such actions shall result in any third party cost or expense to Seller. In the event Buyer elects to make a request pursuant to this Section 7.3 the parties hereto agree to negotiate in good faith appropriate amendments to this Agreement, including, but not limited to, the closing procedures and Seller's representations and warranties, all at Buyer's sole cost and expense.

10.   Seller and Buyer agree that at Closing, Buyer shall receive a credit of $200,000 for environmental matters relating to the Property.

11.   This Amendment may be executed in separate counterparts, each of which shall be an original and all of which when taken together shall constitute one and the same instrument.  Further, this Amendment may be executed by facsimile or by portable document format (.pdf) signature, such that execution of this Amendment by facsimile or by portable document format (.pdf) signature shall be deemed effective for all purposes as though this Amendment was executed as a "blue ink" original.

12.   The Agreement, as amended hereby, shall be and remain in full force and effect and is hereby ratified and confirmed by Seller and Buyer.  To the extent any of the terms and provisions of the Agreement are inconsistent with the terms and provisions of this Amendment, the terms and provisions of this Amendment shall govern and control.

13.   Neither this Amendment nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument in writing signed by the party against which the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

IN WITNESS WHEREOF, Seller and Buyer have executed this Amendment to be effective as of the date set forth above.

SUFFERN PARTNERS LLC

By:      GOLDMANRX, INC.

By:_____
Name:   Isaac Lefkowitz
Title:    President

TT HOLDER ENTITY LLC

By:_____
Name:
Title:

IN WITNESS WHEREOF, Seller and Buyer have executed this Amendment to be effective as of the date set forth above.

SELLER:

SUFFERN PARTNERS LLC

By:　　　GOLDMANRX, INC.


By:_____
Name:　Isaac Lefkowitz
Title:　President


TT HOLDER ENTITY LLC

By:_____
Name:
Title: